JUNG QUEY et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 3, 1915.)

No. 2527.

1. CONSPIRACY ⟨⟩43—INDICTMENT—OVERT ACTS—INTENT.
   An indictment which alleges that the defendant willfully, unlawfully, and feloniously conspired to willfully, fraudulently, and knowingly receive opium, which, as they knew, had been imported into the United States contrary to law, and charged the commission of certain overt acts in pursuance of the alleged conspiracy and to effect and accomplish its object, sufficiently alleges that the overt acts were knowingly and fraudulently done.
   [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 79, 80, 84–99; Dec. Dig. ⟨⟩43.]

2. CONSPIRACY ⟨⟩27, 41—ELEMENTS OF OFFENSE—OVERT ACT.
   One overt act is all that is required to complete the offense of conspiracy, and the act of one conspirator is the act of all.
   [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 38, 39, 74; Dec. Dig. ⟨⟩27, 41.]

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. CRIMINAL LAW ⬅️1035—APPEAL—PRESENTING QUESTIONS BELOW—JUROR—WAIVER OF OBJECTIONS.

Defendants cannot object, on error to their conviction on the second trial, to the presence on the jury of one whom they peremptorily challenged at the first trial, but who was not shown to be disqualified, and whom they did not again challenge, though they did not exhaust their peremptory challenges.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2633–2638, 2643, 2644; Dec. Dig. ⬅️1035.]

4. WITNESSES ⬅️274—CROSS-EXAMINATION—CHARACTER WITNESS.

A witness who testified to the good reputation of one accused of a crime may be properly cross-examined as to whether he has ever heard of the defendant being accused of acts inconsistent with the character attributed to him.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 965, 966; Dec. Dig. ⬅️274.]

5. CRIMINAL LAW ⬅️1170½—APPEAL—HARMLESS ERROR—QUESTION TO WITNESS.

Questions to witness, who had testified to the good reputation of one charged with conspiring to receive opium imported contrary to law, as to whether defendant had been in the opium business, and whether it was part of his general reputation that opium had been found in his room time and time again, and that he had tried to enter into an unlawful combination with customs inspectors, though erroneous in form, were not so prejudicial to defendant as to require a reversal, especially where the answers were favorable to the defendant.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3129–3135; Dec. Dig. ⬅️1170½.]

6. CRIMINAL LAW ⬅️37—DEFENSE—CONSENT OF GOVERNMENT OFFICERS.

It is no defense to a prosecution for conspiracy to receive opium imported contrary to law that the opium was taken ashore by a steward, not one of the defendants, with the permission of the United States officers, given for the purpose of detecting the criminals.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 42; Dec. Dig. ⬅️37.]

In Error to the District Court of the United States for the First Division of the Northern District of California; M. T. Dooling, Judge.

Jung Quey, alias Sam Kee, and others, were convicted of conspiring to import opium contrary to law, and they bring error. Affirmed.

Wm. Hoff Cook and J. C. Campbell, both of San Francisco, Cal., for plaintiffs in error.

John W. Preston, U. S. Atty., of San Francisco, Cal., for the United States.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge. Section 37 of the Criminal Code of the United States, as amended (Act March 4, 1909, c. 321, 35 Stat. 1096 [Comp. St. 1913, § 10201]), declares:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the

conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

By its act of January 17, 1914, entitled "An act to amend an act entitled 'An act to prohibit the importation and use of opium for other than medicinal purposes'" (St. Leg. 1913–14, p. 275, c. 9), Congress provided as follows:

"That after the first day of April, nineteen hundred and nine, it shall be unlawful to import into the United States opium in any form or any preparation or derivative thereof: Provided, that opium and preparations and derivatives thereof, other than smoking opium or opium prepared for smoking, may be imported for medicinal purposes only, under regulations which the Secretary of the Treasury is hereby authorized to prescribe, and when so imported shall be subject to the duties which are now or may hereafter be imposed by law.

"Sec. 2. That if any person shall fraudulently or knowingly import or bring into the United States, or assist in so doing, any opium or any preparation or derivative thereof contrary to law, or shall receive, conceal, buy, sell, or in any maner facilitate the transportation, concealment, or sale of such opium or preparation or derivative thereof after importation, knowing the same to have been imported contrary to law, such opium or preparation or derivative thereof shall be forfeited and shall be destroyed, and the offender shall be fined in any sum not exceeding $5,000 nor less than $50 or by imprisonment for any time not exceeding two years, or both. Whenever, on trial for a violation of this section, the defendant is shown to have, or to have had, possession of such opium or preparation or derivative thereof, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant shall explain the possession to the satisfaction of the jury.

"Sec. 3. That on and after July first, nineteen hundred and thirteen, all smoking opium or opium prepared for smoking found within the United States shall be presumed to have been imported after the first day of April, nineteen hundred and nine, and the burden of proof shall be on the claimant or the accused to rebut such presumption."

Under those laws the plaintiffs in error were indicted in the court below—the indictment containing two counts. The first count charged in substance that within the jurisdiction of the court below, and on the 29th day of January, 1914, they and one Yik Fat willfully, unlawfully, and feloniously conspired and agreed together, and with divers other persons to the grand jurors unknown, to willfully, unlawfully, and knowingly import, and assist in so doing, from some foreign port or place to the grand jurors unknown, seven skins or bladders containing 14 pounds of opium prepared for smoking purposes, contrary to law; that the said conspiracy continued in existence to and including the commission of the overt acts alleged, and that in furtherance of the said conspiracy, and to effect and accomplish the object thereof, the said Li Cheung and Yik Fat, on or about the 30th day of January, 1914, brought into the port of San Francisco, in the state and Northern district of California, from some foreign port or place to the grand jurors unknown, seven skins or bladders containing 14 pounds of opium prepared for smoking purposes, contrary to law; that in further furtherance of the said conspiracy, and to effect and accomplish its object, the said Li Cheung and Yik Fat on the same day, to wit, January 30, 1914, on the steamship China, then and there lying and being in the port of San Francisco, prepared seven skins or bladders containing 14 pounds of opium prepared for smoking purposes, which

said opium had theretofore been brought into the United States from some foreign port or place to the grand jurors unknown, for the purpose of causing the same to be delivered to the said Jung Quey, alias Sam Kee; that in further furtherance of the said conspiracy, and to effect and accomplish its object, the said Li Cheung and Yik Fat on the same day, to wit, January 30, 1914, on the said steamship China, then and there lying and being in the port of San Francisco, then and there delivered seven skins or bladders containing 14 pounds of opium prepared for smoking purposes, to one H. Matthaei, a quartermaster on said steamship China, for the purpose of having the said opium delivered to the said Jung Quey, alias Sam Kee; that in further furtherance of the said conspiracy, and to effect and accomplish its object, the said Mon Hing and Jt Yee, on the 31st day of January, 1914, at the city and county of San Francisco, in the state and Northern district of California, received seven skins or bladders containing 14 pounds of opium prepared for smoking purposes, which said opium had theretofore been brought into the United States from some foreign port or place to the grand jurors unknown, contrary to law, by the said Li Cheung and Yik Fat—against the peace and dignity of the United States, and contrary to the form of its statute in such case made and provided.

The second count charged in substance that the said Jung Quey, alias Sam Kee, Li Cheung, Yik Fat, Mon Hing, and Jt Yee, on the 29th day of January, 1914, and within the jurisdiction of the court below, did willfully, unlawfully, and feloniously conspire together, and with divers other persons to the grand jurors unknown, to willfully, fraudulently, and knowingly receive and conceal seven skins or bladders containing 14 pounds of opium prepared for smoking purposes, which they then and there well knew had been imported into the United States contrary to law; that the said conspiracy was continued in force to and including the commission of each of the overt acts thereinafter alleged; that in furtherance of the said conspiracy, and to effect and accomplish its object, the said Li Cheung and Yik Fat, on or about the 30th day of January, 1914, brought into the port of San Francisco, in the state and Northern district of California, from some foreign port or place to the grand jurors unknown, seven skins or bladders containing 14 pounds of opium prepared for smoking purposes, contrary to law; that in further furtherance of the said conspiracy, and to effect and accomplish its object, the said Li Cheung and Yik Fat on the same day, to wit, January 30, 1914, on the steamship China, then and there lying and being in the port of San Francisco, in the state and Northern district of California, prepared seven skins or bladders containing 14 pounds of opium prepared for smoking purposes, which said opium had theretofore been brought into the United States from some foreign port or place to the grand jurors unknown, contrary to law, for the purpose of causing the same to be delivered to the said Jung Quey, alias Sam Kee; that in further furtherance of the said conspiracy, and to effect and accomplish its object, the said Li Cheung and Yik Fat on the same day, to wit, January 30, 1914, on the steamship China, then and there lying and being in the port of San Francisco, in

the state and Northern district of California, then and there delivered seven skins or bladders containing 14 pounds of opium prepared for smoking purposes to one H. Matthaei, a quartermaster on said steamship China, for the purpose of having the said opium delivered to said Jung Quey, alias Sam Kee; that in further furtherance of the said conspiracy, and to effect and accomplish the object thereof, the said Mon Hing and Jt Yee, on the 31st day of January, 1914, at the city and county of San Francisco, in the state and Northern district of California, received seven skins or bladders containing 14 pounds of opium prepared for smoking purposes, which said opium had theretofore been brought into the United States from some foreign port or place to the grand jurors unknown, contrary to law, by the said Li Cheung and Yik Fat—against the peace and dignity of the United States, and contrary to its statute in such case made and provided.

The defendants questioned the sufficiency of the indictment by demurrer, which being overruled, they pleaded not guilty, and the case came on for trial, resulting in an acquittal of all of the defendants on the first count, and an acquittal of the defendant Yik Fat on the second count, and a disagreement of the jury as to the other defendants upon the second count of the indictment. Those defendants subsequently came on for a second trial on the second count, upon which second trial they appear to have interposed "pleas of former acquittal" as to each of them, and that trial resulted in this verdict:

"We, the jury, find Jung Quey, Li Cheung, Mon Hing, and Jt Yee, the defendants at bar, guilty on the second count of the indictment herein.
                                         "John G. Barker, Foreman."
"We, the jury, find for the defendants at the bar upon their pleas of former acquittal of the offenses charged in the first count of the indictment.
                                         "John G. Barker, Foreman."
"We, the jury, find for each of the defendants at the bar upon his pleas of former acquittal of conspiracy with Yik Fat alone.
                                         "John G. Barker, Foreman."

Upon that verdict, judgment was entered against the plaintiffs in error upon the second count of the indictment.

[1] It is here contended on their behalf that the second count fails to allege a conspiracy to do any unlawful act, that none of the overt acts are therein alleged to have been knowingly and fraudulently done, and that there is no overt act alleged as to the defendant Jung Quey. The second count expressly alleges that the present plaintiffs in error and Yik Fat did willfully, unlawfully, and feloniously conspire and agree together and with divers other persons to the grand jurors unknown—

"to willfully, fraudulently, and knowingly receive and conceal seven skins or bladders containing 14 pounds of opium prepared for smoking purposes, which, as they, the said Jung Quey, alias Sam Kee, Li Cheung, Yik Fat, Mon Hing, and Jt Yee, then and there knew, had been imported into the United States contrary to law."

It is perfectly clear that such agreement, if so entered into, was in direct violation of the act of Congress above set out. And as the overt acts are alleged to have been committed in pursuance of the alleged conspiracy, and to effect and accomplish its object, necessarily, if committed, they were knowingly, unlawfully, and feloniously committed.

[2] That the overt act of one conspirator is the act of all does not admit of question, nor that the commission of one such overt act is all that is required to complete the offense. There is no merit in the demurrer, and it was properly overruled.

[3] The bill of exceptions shows that on the first trial of the defendants four talesmen were peremptorily challenged by them, and their names were thereupon restored to the jury box of the court, and that . . upon the impanelment of a jury for the second trial the names of those four were again called among the first twelve drawn from the box for examination as to their qualifications to serve as jurors upon the second trial; that the defendants again peremptorily challenged three of the four, but the fourth was not challenged, and was sworn and impaneled as a juror before the defendants had exhausted their peremptory challenges. There is nothing in the record to show that that juror was in any respect disqualified, and his acceptance by the defendants under the circumstances stated is a sufficient answer to their present objection that he was upon the jury.

[4] On the trial a witness—one Belden—was called on behalf of the defendants and testified that the general reputation of the defendant Jung Quey was good, and on cross-examination was questioned and answered as follows:

"Q. I will ask you if it is not a fact that he was in the opium business in Nevada?

"Mr. Cook: Objected to, and I assign it as a prejudicial error on the part of the district attorney.

"A. I never heard of it; I never heard of his connections with opium at all.

"Q. Is it not a part of his reputation that opium has been found in his room time and time again?

"Mr. Cook: The same objection.

"A. Never.

"Q. Is it not a part of his general reputation that he has sent for customs inspectors and other people, and tried to enter into unlawful combination with them for the purpose of getting opium?

"A. I never heard of it. I have known of his reputation from his associations from his connections with my father-in-law in Nevada, in the railroad business furnishing contract labor. My father is general superintendent of the Southern Pacific Railroad, and I believe Jung Quey furnishes Chinese labor to the railroad. I never heard anything against his reputation."

[5] Where a witness testifies to the good reputation of a party, he may be properly asked on cross-examination whether he has ever heard if the person in question has been accused of doing acts wholly inconsistent with the character which he has attributed to him. People v. Gordan, 103 Cal. 573, 37 Pac. 534; People v. Mayes, 113 Cal. 624, 45 Pac. 860; People v. Perry, 144 Cal. 750, 78 Pac. 284. While the form of the questions propounded to the witness in this case was, we think, objectionable, we do not think they justify a reversal of the judgment, especially in view of the fact that the answers of the witness were favorable to the defendant.

[6] An instruction requested by the defendants to be given to the jury, and which the court refused, to which action an exception was taken and is here assigned as error, is as follows:

"I instruct you that, if you find from the evidence that the quartermaster, Matthaei, took any opium prepared for smoking purposes from the steamship

China on January 30, 1914, while she was in the port of San Francisco, and that he did so with the permission of the government, through its duly authorized officers, then I instruct you that such opium was not being unlawfully transported after its importation, and the receipt of such opium by any person thereafter, by any person, from said quartermaster, was not an unlawful act, and therefore cannot be considered by you as an unlawful act done in pursuance of the conspiracy, as alleged in the indictment, and such testimony cannot be considered by you as establishing in any degree the guilt of any of the defendants of the conspiracy as alleged in the indictment."

The correctness of the ruling of the trial court in respect to that matter may be sufficiently shown by a reference to the case of Grimm v. United States, 156 U. S. 604, 15 Sup. Ct. 470, 39 L. Ed. 550, where a post office inspector, Robert W. McAfee, sent through the post office certain letters to fictitious persons. The court there said:

"That McAfee was and had been for years a post office inspector in the employ of the United States, and at the same time an agent of the Western Society for the Suppression of Vice; that for some reasons not disclosed by the evidence McAfee suspected that defendant was engaged in the business of dealing in obscene pictures, and took this method of securing evidence thereof; that after receiving the letters written by defendant, he, in name of Huntress and Waters, wrote for a supply of the pictures, and received from defendant packages of pictures which were conceded to be obscene. Upon these facts it is insisted that the conviction cannot be sustained, because the letters of defendant were deposited in the mails at the instance of the government, and through the solicitation of one of its officers; that they were directed and mailed to fictitious persons; that no intent can be imputed to defendant to convey information to other than the persons named in the letters sent by him; and that, as they were fictitious persons, there could in law be no intent to give information to any one. This objection was properly overruled by the trial court. There has been much discussion as to the relations of detectives to crime, and counsel for defendant relies upon the cases of United States v. Whittier, 5 Dill. 35 [Fed. Cas. No. 16,688], United States v. Matthews [C. C.] 35 Fed. 890 [1 L. R. A. 104], United States v. Adams [D. C.] 59 Fed. 674, and Saunders v. People, 38 Mich. 218, in support of the contention that no conviction can be sustained under the facts in this case. It is unnecessary to review these cases, and it is enough to say that we do not think they warrant the contention of counsel. It does not appear that it was the purpose of the post office inspector to induce or solicit the commission of a crime, but it was to ascertain whether the defendant was engaged in an unlawful business. The mere facts that the letters were written under an assumed name, and that he was a government official—a detective, he may be called—do not of themselves constitute a defense to the crime actually committed. The official, suspecting that the defendant was engaged in a business offensive to good morals, sought information directly from him, and the defendant, responding thereto, violated a law of the United States by using the mails to convey such information, and he cannot plead in defense that he would not have violated the law if inquiry had not been made of him by such government official. The authorities in support of this proposition are many and well considered."

See, also, Andrews v. United States, 162 U. S. 420, 16 Sup. Ct. 798, 40 L. Ed. 1023.

The charge of the court below presented the case to the jury fully and fairly, and we discover in the record no error for which a reversal of its judgment would be justified.

The judgment is affirmed.